ELECTRONIC

**Oct. 21, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

## CASE NO. 08-81215-CIV-HURLEY/HOPKINS

SUPREME FUELS TRADING FZE,

      Plaintiff,

vs.

HARRY SARGEANT III, MUSTAFA ABU-NABA'A,
INTERNATIONAL OIL TRADING COMPANY, LLC
and INTERNATIONAL OIL TRADE CENTER,

      Defendants.

_____/

### COMPLAINT

Plaintiff Supreme Fuels Trading FZE (formerly known as Supreme Fuels GmbH & Co. KG, collectively "Supreme"), for its Complaint against defendants Harry Sargeant III, Mustafa Abu-Naba'a, International Oil Trading Company, LLC ("IOTC"), and International Oil Trade Center ("IOTC Jordan"), based on personal knowledge as to Supreme's own acts and on information and belief as to all other matters, alleges as follows:

### SUMMARY OF THE ACTION

1.    This case is about defendants' conspiracy since 2004 to bribe key Jordanian government officials to ensure that defendants would be the sole recipients of more than one billion dollars worth of U.S. government contracts for the supply of fuels to the U.S. military in Iraq.

2.    These U.S. contracts require eligible bidders to have a Letter of Authorization

1

("LOA") from the Jordanian government allowing the transport of fuels across Jordan into Iraq. The U.S. government will not accept a bid from a company that does not have an LOA from Jordan. Through their bribery scheme, defendants have ensured that IOTC (or IOTC Jordan) was the only bidder to obtain the necessary LOA. As a result of this scheme, defendants have won every contract up for bid since 2004.

3.      But for this scheme, plaintiff Supreme would have won the most recent Iraq fuels supply contract, awarded in 2007, which was worth more than $900 million. Supreme understands that it bid a lower contract price and offered better terms than IOTC. Supreme has a proven track record with its work as the largest fuels supplier in Afghanistan to both the U.S. military and NATO. And, the U.S. government appeared to be actively seeking to explore options for bulk fuel supply through companies other than IOTC. However, Supreme was ultimately excluded from the bid because defendants' scheme prevented Supreme from obtaining the required LOA.

4.      Over the life of their conspiracy, defendants have caused the U.S. government to pay tens of millions of dollars more for fuel in Iraq than it otherwise would have paid if the bids had been subject to open competition. The Committee on Oversight and Government Reform of the United States House of Representatives ("Oversight Committee"), in an October 16, 2008 report (the "Oversight Committee Report") to Defense Secretary Robert M. Gates, presented detailed evidence that IOTC has overcharged the U.S. government under these contracts. The Oversight Committee wrote that:

> [O]fficials from the [United States Department of Defense] briefed
> Committee staff about allegations that the International Oil Trading
> Company (IOTC), which is owned by Harry Sargeant, has been
> overcharging the U.S. government under contracts to deliver fuel through
> Jordan into Iraq. If this briefing and the documents reviewed by the
> Committee are accurate, Mr. Sargeant's company appears to have engaged

in a reprehensible form of war profiteering.

The Oversight Committee further asserted that in all of its oversight activities into Iraq procurement problems since the war's beginning, "[t]he IOTC contracts stand out for the extent of the company's apparent profiteering." The Oversight Committee also noted that IOTC made a profit of more than $210 million under its contracts – at a profit margin of over 14% – netting at least $70 million for defendant Sargeant personally. Had the IOTC contracts been awarded instead to the lowest bidders, the Oversight Committee stated, the taxpayers could have saved more than $180 million.

5.     Supreme brings this action under Section 1962(a), (c) and (d) of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, Section 1 of the Sherman Act, and under Florida law, to enjoin defendants from continuing to participate in this illegal and anticompetitive scheme and to recover damages based on the profits that Supreme otherwise would have earned under the 2007 contract.

## JURISDICTION AND VENUE

6.     Supreme brings this action under the RICO Act, 18 U.S.C. § 1962, and under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, to recover damages for and prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Supreme also brings this action under the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.103; the Florida Antitrust Act, Fla. Stat. § 542.18; Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq*, and Florida common law for tortious interference with business relations. This Court has jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367.

7.     Venue is proper in this judicial district under 28 U.S.C. § 1391 and 15 U.S.C. § 22

3

because each defendant is a corporation or person that is found or transacts business in this district, and a substantial portion of the challenged conduct, trade and commerce described herein has been carried out in this district, including meetings between defendants and their co-conspirators relating to the formation of IOTC Jordan and the Iraq fuels contracts at issue in this case.

8.     This Court has personal jurisdiction over defendants because they either reside, maintain offices, or conduct substantial business in this District, and/or engaged in a substantial portion of the challenged conduct in this District.

9.     The violations of federal law alleged herein have substantially affected interstate and foreign commerce.  They involve more than one billion dollars worth of U.S. government contracts for the supply and delivery of fuels overseas.  These contracts are bid on by companies located in the United States and from around the world.  The bids are sent to and evaluated by the Department of Defense's Defense Energy Support Center ("DESC"), located in Fort Belvoir, Virginia.  Payments under the contract are sent from other locations in the U.S. including the Defense Finance and Accounting Service located in Columbus, Ohio.

## THE PARTIES

### A.     Plaintiff

10.     Plaintiff Supreme Fuels Trading FZE is incorporated and headquartered in the United Arab Emirates.  It is a subsidiary of Supreme Foodservice AG, which is headquartered in Switzerland.  Supreme, Supreme Foodservice, and their various affiliates (collectively, the "Supreme Group") have been in the business of providing support service to military and non-military customers in both developed and undeveloped regions of the world for more than fifty years.  Included among the military support services the Supreme Group provides are bulk fuels

4

supply; food supply and catering; heavy equipment supply; building construction, maintenance and repair; facility management; technical services and support; quality control and logistics; and PX retail services.

11.     The Supreme Group specializes in providing these military support services in regions of the world that are unsettled, in crisis, and with limited infrastructure. The Supreme Group currently supplies the U.S. military in Afghanistan. It also services military contingents from NATO, the United Nations, EUFOR (European Union Force), and roughly twenty other nations in such places as Afghanistan, Iraq, Kuwait, Pakistan, Kosovo, Bosnia, Ivory Coast, Liberia, Syria, and Darfur.

12.     Supreme is currently one of the largest bulk fuels suppliers to the U.S. military in Afghanistan, supplying to key U.S. installations within the country tens of millions of gallons of aviation and ground fuels from refineries in Pakistan. Supreme is also the largest fuels supplier to NATO in Afghanistan and is a major fuels supplier in Afghanistan to the militaries of Germany, the United Kingdom, Sweden, Australia, Spain, Slovenia, Italy, Lithuania, the Netherlands, Belgium, and Portugal.

**B.     Defendants**

13.     Defendant IOTC is a limited liability company based in Boca Raton, Florida. It was formed in January 2005 by defendants Sargeant and Abu-Naba'a to bid on U.S. government contracts for the shipment of fuels to the U.S. troops in Iraq.

14.     Defendant Harry Sargeant, III is a United States citizen residing in Palm Beach County, Florida who owns a one-half interest in and is the general manager of IOTC.

15.     Defendant Mustafa Abu-Naba'a is a citizen of the Dominican Republic residing in Palm Beach County, Florida who owns the other one-half interest in IOTC.

5

16.     Defendant IOTC Jordan is a Jordanian company formed in January 2004 by defendants Sargeant and Abu Naba'a, and by Mohammad Anwar Farid Al-Saleh.  Like IOTC, IOTC Jordan was created to bid on U.S. government contracts for the shipment of fuels to the U.S. troops in Iraq.  Defendants Sargeant and Abu Naba'a, and co-conspirator Al Saleh each own a one-third interest in the company.

### C.     Co-Conspirators

17.     Mohammad Anwar Farid Al-Saleh is a Jordanian citizen residing in Jordan.  He is married to Princess Alia Al Hussein, a half-sister of the current King of Jordan, King Abdullah II.

18.     Unknown Jordanian officials have been involved in the conspiracies alleged herein through their agreements with defendants and Al-Saleh to issue exclusively to defendants -- and to no other company bidding on the U.S. contracts -- the necessary Jordanian authorizations required under the U.S. government contracts to supply fuels in Iraq.  In exchange for these agreements, defendants have paid these officials tens of millions of dollars over the course of the conspiracy.

### FACTUAL BACKGROUND

### A.     The Formation of IOTC Jordan

19.     Immediately after the start of United States military operations in Iraq in 2003, the U.S. government began a program to supply aviation and ground fuels to the more than 100,000 U.S. troops serving there.  The first contract was awarded in a no-bid contest to Kellogg, Brown & Root, then a subsidiary of Halliburton Energy Services.  The U.S. government soon cancelled this contract over claims that Halliburton was overcharging the government by tens of millions of dollars.

6

20.     In the wake of the Halliburton controversy, the government tasked the DESC to act as the government's procurement office for selecting through competitive bidding processes the fuels supply contractors to the U.S. military in Iraq.  In January 2004, defendants Sargeant and Abu-Naba'a along with co-conspirator Al Saleh formed IOTC Jordan for the purpose of participating in the newly created DESC bidding process for the Iraq supply contracts.

21.     DESC, as part of their Iraq bid solicitations, has required that fuels supplied under their contracts have to be delivered through Jordan.  Consequently, one of the prerequisites for obtaining a DESC contract award is a LOA from the Jordanian government permitting the transport of fuel across Jordan into Iraq.

22.     In forming IOTC Jordan, defendants Sargeant and Abu-Naba'a brought in Al-Saleh as a partner for the specific purpose of obtaining the necessary LOA and dealing with any other bureaucratic or political hurdles the company might face in transporting fuel across Jordan.  Al-Saleh was well positioned to handle these tasks through his connections in the Jordanian government, and in particular, his close family connection to King Abdullah II.  Al-Saleh is the King's brother-in-law.   In exchange for capitalizing on his government and Royal Family connections and a relatively modest financial investment in the company, Al-Saleh was provided a one-third ownership interest in the company and the right to share in one-third of the profits the company earned from its DESC contract work.

### B.     The LOA Bribery Scheme

23.     In March 2004, DESC awarded its first fuels contract (the "First Contract") to Shaheen Business and Investment Group, a Jordanian company owned by Khaled Shaheen and his brothers.  At the time, the Shaheens had close personal and business connections with the government of Jordan.  The U.S. government cancelled this contract after only one week because

7

it found that the company failed to meet its obligations under the contract. There were also questions raised regarding the company's previous involvement in purportedly smuggling millions of barrels of oil out of Iraq in violation of the United Nations Oil-for-Food Program.

24.     In April 2004, DESC re-awarded the First Contract to IOTC Jordan and Trigeant Ltd., another company in which defendant Sargeant had a significant ownership interest. According to DESC, it awarded the contract to IOTC/Trigeant because they had been next in line for the contract under the original bid. The contract was worth roughly $80 million over the course of a year.

25.     Al-Saleh had obtained the necessary LOA to enable IOTC Jordan to qualify for the First Contract. More importantly, Al-Saleh used his connections to broker an agreement with certain high-level officials of the Jordanian government under which IOTC Jordan would be the only DESC bidder with an LOA from Jordan. In exchange for the exclusive LOA, defendants agreed to make regular payments to these Jordanian officials based on a per ton fee for each ton of fuel IOTC Jordan supplied under the DESC contract. This has amounted to tens of millions of dollars over the course of the conspiracy. Consequently, other than IOTC Jordan, none of the remaining bidders on the original contract was able to secure the necessary LOA. As the Oversight Committee Report explained, leveraging its ties to the Royal Family to obtain an exclusive LOA "gave IOTC a monopoly on the delivery of fuel through Jordan."

26.     Several months after the April 2004 re-award, DESC cancelled its contract with IOTC Jordan and Trigeant and awarded to IOTC Jordan, through a new bidding process, another fuels contract (the "Second Contract") also worth roughly $80 million over the course of a year. Pursuant to defendant's bribery scheme, and in exchange for defendants' continued payments to certain key Jordanian government officials, these officials ensured that IOTC Jordan was once

again the only bidder with a valid LOA.

### C. The Formation of IOTC

27.     Defendants Sargeant and Abu-Naba'a formed defendant IOTC in January 2005 which though using a different name than IOTC Jordan – International Oil Trading Company compared to International Oil Trade Center – used the identical acronym.  Defendants formed IOTC without the knowledge or consent of Al-Saleh and without giving him the opportunity to participate in the management, operations, or ownership of the company.

28.     At around the same time, defendants Sargeant and Abu-Naba'a created other "IOTC" entities without the knowledge and consent of Al-Saleh and without giving him the opportunity to participate in the companies.   Among these additional related entities was International Oil Trading Free Zone Company, known as IOTC Dubai.

29.     According to a recently filed and currently pending lawsuit that Al-Saleh brought against defendants Sargeant and Abu-Naba'a in Florida state court, Sargeant and Abu-Naba'a -- without Al-Saleh's knowledge -- substituted IOTC for IOTC Jordan as the name of the party under the 2004 DESC contract.  They also substituted without Al-Saleh's knowledge IOTC as the bidding party on a DESC contract (the "Third Contract") that they were awarded in May 2005. This contract was worth roughly $200 million.   Once again, pursuant to defendants' bribery scheme, IOTC Jordan was the only bidder with a valid LOA.

30.     According to the Al-Saleh lawsuit, IOTC became the entity that received the U.S. government payments under these contracts and, along with the other newly created "IOTC" entities, acted to divert other funds rightfully belonging to IOTC Jordan and Al-Saleh.  Al-Saleh is suing defendants to recover these diverted funds and the profits to which he claims he is otherwise entitled through his one-third ownership in IOTC Jordan.

31.     Throughout the duration of the First, Second and Third contracts, defendants continued to pay certain Jordanian officials a per-ton fee for guaranteeing that defendants would remain the only DESC contract bidder with a valid LOA from Jordan.  With this agreement firmly in place, defendants had no further use for Al-Saleh and his political connections.  They also had no further need to continue paying him his one-third profit share to maintain those connections and the agreement with these high-level government officials.  By cutting him out and taking over his ownership stake, defendants Sargeant and Abu-Naba'a could both increase their profits and their illicit payments to the Jordanian officials to ensure the LOA scheme continued unabated.

32.     According to the Oversight Committee Report, internal U.S. Defense Department documents show that the prices that IOTC charged the government under the contracts were not "fair and reasonable," as federal procurement law requires.    The Defense Department nonetheless had no choice but to accept IOTC's pricing to satisfy its "urgent military need" for the fuel supply route through Jordan.

**D.     Supreme's Exclusion from the Bidding for the Fourth DESC Contract**

33.     Al-Saleh ultimately learned of IOTC's formation and its substitution for IOTC Jordan in the DESC contracts.  However, defendants Sargeant and Abu-Naba'a were for some time able to hide from Al-Saleh their true plan to assume his ownership stake in the company and the profits that went with it.  They convinced him that his ownership interest in IOTC Jordan was secure and that he would still be entitled to one-third of the profits from the DESC contracts going forward.    He also continued to receive payments from his one-third share of the partnership profits.

34.     In December 2006, the DESC solicited bids on a new contract to deliver fuel

10

through Jordan to Iraq (the "Fourth Contract"). This contract was worth more than $900 million. According to the Oversight Committee Report, seven companies submitted bids, of which four were deemed competitive. Of those four, IOTC bid the second highest price. Once again, because of defendants' bribery scheme, no other bidder was able to obtain the necessary LOA to bid successfully on the Fourth Contract.

35.     In May 2007, because IOTC alone could provide the LOA, DESC awarded the Fourth Contract to IOTC. The Fourth Contract was the fourth consecutive contract that DESC awarded to defendants since DESC took charge of the government procurement process for supplying fuels to the U.S. military in Iraq. It was also the fourth consecutive time in which defendants were the only bidders with an LOA.

36.     Shortly after securing the Fourth Contract, defendants Sargeant and Abu-Naba'a attempted to get Al-Saleh to sign a release that would be a full and final settlement of all amounts they owed him under the DESC contracts. He refused to sign the release and defendants have not made any further payments to him under the contracts. He filed his action against defendants several months later.

### E.     Supreme's Exclusion From the Re-Bidding for the Fourth Contract

37.     Meanwhile, several months after it awarded the Fourth Contract to IOTC, DESC opened that contract up for re-bidding. DESC re-bid the Fourth Contract partly in response to complaints about the process by an unsuccessful bidder that had been unable to obtain an LOA. The Fourth Contract was supposed to last as long as three years, but the government wanted to see if it could do better with another supplier. Under the existing IOTC contract, which was significantly larger than the previous ones, there was a chronic lack of capacity because of limitations on fuel storage and accessibility. The government's re-bid was likely to address this

11

contract deficiency.

38.     The government's re-bid was likely also the result of the growing tension that existed between DESC and IOTC over the large number of IOTC trucks that were being destroyed by the U.S. military.  For security reasons, the military had a strict policy of destroying – rather than leaving to enemy plunder – fuel trucks that broke down and could not be immediately repaired.  IOTC had complained about and sought compensation for the large number of trucks it was losing because of this policy.  At the time of the re-bid, the parties had not resolved their differences over this issue.  This on-going dispute was adversely affecting the delivery schedule under which IOTC was supposed to operate and was threatening to further upset IOTC's overall performance under the contract.  Moreover, around this time, the U.S. government was forced to pay IOTC several million dollars to settle a dispute the parties had in connection with one of IOTC's prior DESC contracts in Iraq.

39.     It was against this backdrop that DESC issued a request for proposals for bidders to take over the Fourth Contract.  Plaintiff Supreme responded with a contract bid in November 2007.  As part of its bid package, Supreme indicated that it would be contracting the Jordanian transport work to Ramiz Ammari Company ("RAC"), a Jordanian company that was already licensed and authorized to conduct bulk fuel import/export and transportation work in Jordan. Supreme attached to its bid a copy of the RAC's Jordanian license.

40.     Shortly after Supreme submitted its November 2007 bid, DESC informed Supreme that its bid did not comply with DESC requirements because Supreme was not on the list of approved vendors who had obtained the necessary LOA from the Jordanian Ministry of Energy and Mineral Resources.  DESC told Supreme that the LOA was still required despite RAC's license to do the transport work through Jordan.

12

41.     On November 28, 2007, Supreme wrote the Jordanian Minister of Energy and Mineral Resources requesting that Supreme be included on the list of vendors that had the necessary LOA to transport fuel across Jordan under the DESC contract.  Supreme attached to this letter the RAC commercial license to operate in Jordan and the letter of commitment from RAC to work with Supreme on the DESC contract.

42.     Supreme also had several in-person meetings with representatives of the Ministry of Energy.  At no time did the Ministry suggest that Supreme failed to meet any conditions or criteria or was otherwise ineligible for the LOA.  Instead, Ministry officials repeatedly represented to Supreme that the requested LOA would be issued imminently.

43.     On January 23, 2008, Supreme wrote to King Abdullah II similarly requesting the necessary LOA for the DESC contract.  Supreme explained the significant benefits that would come to Jordan if Supreme were to secure the DESC contract including the employment of roughly 1,700 Jordanian nationals and the large infrastructure investment Supreme would be making in building and maintaining a bulk fuel storage and handling facility in the port of Aqaba.  Supreme also made clear that in partnership with RAC, Supreme had already carried out all of the logistical and technical preparations needed to successfully carry out the contract.  In requesting the LOA, Supreme did not ask for any special or favorable treatment.  It merely sought to make sure "that our company is equitably and fairly treated as any other operator in the Kingdom."

44.     Several days later, Supreme followed up its letter with a personal meeting with representatives of the King at the Royal Court of Jordan.  Supreme was told that the LOA would soon be issued.  Despite these representations, the Ministry of Energy never issued Supreme the necessary LOA.  While the DESC provided Supreme with several extensions of the contract

13

deadline to accommodate their expected receipt of the LOA, it ultimately could wait no longer and was forced to disqualify Supreme from the bidding contest.

45.     The Jordanian government never issued Supreme the LOA because of defendants' continuing conspiracy.  While the Jordanian government did issue several LOAs in connection with this contract, none of the recipients of these LOAs -- other than IOTC -- ever actually bid on the contract.  Rather, they were merely "fronts" for officials of the Jordanian government that were created to remove any suspicion that the LOAs were being inappropriately withheld.

46.     Consequently, IOTC retained the Fourth Contract.  Despite its retention of the Fourth Contract, the Pentagon recently confirmed that IOTC did not provide the lowest bid for the contract.  But it was the only bidder with the necessary LOA from Jordan.

## ILLEGAL CONDUCT

### A.     The LOA Conspiracy

47.     In 2004, defendant Sargeant, defendant Abu-Naba'a, Al-Saleh, and their company, defendant IOTC Jordan, orchestrated a conspiracy with key Jordanian government officials under which they agreed to issue exclusively to defendant IOTC Jordan the required LOA so it would be the only company that would qualify for the DESC contracts to supply fuels in Iraq through Jordan.  In return, Al-Saleh was given a one-third profit share from the company's work on the DESC contracts, and these Jordanian officials were paid a per ton fee for the fuels supplied under the contracts.

48.     In his lawsuit, Al-Saleh acknowledged the original role he played in using "his connections and influence" to secure the LOA for defendants and strike a "deal" with Jordanian officials to handle any "bureaucratic interference" associated with the contract:

> He arranged for the Jordanian Ministry of Energy and Mineral Resources
> to issue a letter of authorization to IOTC [Jordan] to transport oil across

14

Jordan to the final destination in Iraq, a prerequisite to the DESC awarding the contract.

Through his connections and influence, he negotiated a deal with the National Resource Development Company ["NRDC"], a company connected to the Jordanian Army, to ensure that the cargo arriving by ship from Saudi Arabia at the Jordanian port of Aqaba would be offloaded from the ships and placed into storage without interference, bureaucratic or otherwise.

49.     In a now-dismissed lawsuit that defendant IOTC brought against Al-Saleh shortly before Al-Saleh's action, IOTC further confirmed Al-Saleh's role and the LOA conspiracy he orchestrated with defendants:

Abu Naba'a contacted [NRDC], a Jordanian governmental organization that could provide the requisite permissions to trans-ship fuel through Jordan. . . . Sargeant and Abu-Naba'a decided that it would be beneficial to involve a local representative in the contract performance . . . . As a result, IOTC-Jordan began to involve [Al-Saleh] . . . whose family contacts with the Royal Family of Jordan were considered a potential value . . . . Al-Saleh was given 33% of the shares of IOTC-Jordan, which was specifically agreed and understood to be solely a method of compensating him for work on the contract. . . . [Al-Saleh] worked with Abu-Naba'a . . . to obtain a memorandum of understanding from the government of Jordan, through NRDC. Pursuant to the memorandum of understanding, Jordan agreed to support [defendants'] oil trading and transport operations in Jordan in return for the payment of a specified fee per ton of oil transported.

50.     This scheme and the illicit payments defendants made to Al-Saleh and the Jordanian government officials continued in place for the Second Contract, the Third Contract, the Fourth Contract, and (for just the Jordanian officials) the re-bid on the Fourth Contract. After Sargeant and Abu-Naba'a formed it in 2005, IOTC joined this conspiracy. Al-Saleh ultimately dropped out of the conspiracy sometime in 2007 after Sargeant and Abu-Nada'a stopped providing him his profit share under the DESC contracts.

51.     All participants upheld their part of the scheme. Defendants and their co-conspirators made their illicit payments to Al-Saleh and the Jordanian officials, and these

15

officials made sure that the Ministry of Energy issued the LOA only to defendants.

52.     The payments made to the Jordanian officials increased with every contract award.  Over the course of the continuing conspiracy, these payments have so far amounted to tens of millions of dollars.

**B.     Restraint of Trade**

53.     As a result of the conspiracy, defendants have won every DESC Iraq fuels supply contract up for bid and foreclosed any other company from securing a contract regardless of price of the bid, its terms, or the qualifications of the bidder.

54.     Because of the conspiracy, and despite the best intentions of the DESC to avoid the pitfalls of the Halliburton controversy that was the catalyst for creating the DESC competitive bidding process, the only criteria that really mattered in these Iraq fuel supply bids was the LOA.  As Al-Saleh admitted in an interview with NBC News after he filed his lawsuit against defendants, "Without the letter, you can't bid . . . .  Whoever got the letter got the contract."

55.     Defendants' scheme, and its exclusion of other companies from the supposedly competitive DESC bidding process, was further outlined by defendant Sargeant in a June 2006 management meeting of IOTC Jordan.  There, in a meeting with Al-Saleh, and other executives of IOTC Jordan, Sargeant identified as one of the company's main objectives the elimination of competition on the DESC contract bids: "The first [objective] was maximizing profits by getting all the contracts and not leaving hope for competitors."  Defendants' scheme accomplished just that by preventing any other company from qualifying for the DESC contracts.

56.     In the absence of this scheme, Supreme clearly would have obtained the necessary LOA.  The Jordanian government made it clear that Supreme qualified for the LOA and that it

16

was otherwise intending to issue Supreme the LOA. In addition, Supreme's business partner, RAC, was already licensed and authorized to do the Jordanian transport work required under the contract. Furthermore, the country was certain to benefit from Supreme's award of the DESC contract through Supreme's substantial investment in the country's infrastructure and its creation of many jobs for Jordanian citizens.

57.    In the absence of the scheme, Supreme also clearly would have won the award for the re-bid of the Fourth Contract. First, it was the only other serious bidder in contention for the contract. The only other bidder had comparatively little, if any, prior experience with supplying fuels into such a hostile, war-torn area as Iraq. In contrast, Supreme was (and remains) the largest bulk fuels supplier to the U.S. military and NATO in Afghanistan.

58.    In fact, Supreme was recently awarded the 2007 Vendor Excellence Award by the U.S. Defense Logistics Agency ("DLA") for Supreme's fuel supply work in Afghanistan. This is the DLA's highest level of distinction. Supreme's award citation reads as follows:

> Supreme Site Services AG is a critical Defense Logistics Agency contractor fulfilling a vital mission for our Nation's warfighters. Supreme secures several grades of fuel from refineries in Pakistan and reliably transports that fuel along treacherous routes to destinations in Pakistan and Afghanistan. Despite significant operational and business risks, Supreme willingly and eagerly accepted the challenges and constantly overcame obstacles to meet its contractual demands. During potential disruptions caused by flooding, tribal disputes, border closings and refinery problems, Supreme consistently persevered to initiate solutions to ensure deliveries. Supreme's stellar performance has earned them this well deserved Vendor Excellence Award.

59.    In addition, Supreme Group is also the U.S. military's major full-line food supplier in Afghanistan for which in 2006 it was recognized by the DLA as the "New Contractor of the Year." Supreme's award citation reads as follows:

> Supreme has successfully implemented the first subsistence prime vendor contract to be fully located in a war zone, providing full line food

17

distribution to all military services in Afghanistan.   Supreme has consistently been a proactive and valued contractor, supporting the warfighter in Afghanistan through a combination of ground, helicopter, and air transportation to over 65 military sights, and risking life, limb, and property in order to ensure mission success.   Supreme has been able to effectively manage this program through: additional transportation assets, an enhanced focus on product flavor and quality, micromanagement of a lengthy and erratic supply pipeline, and most importantly, innovation and flexibility that has helped them maintain competitive pricing and high fill rates in this hostile region.

60.     Furthermore, Supreme Group has been supplying food and other materials to tens of thousands of British, Danish, and Australian troops in Iraq since early 2003.  At the height of its operations there, Supreme Group was making deliveries from its own dedicated distribution center in Kuwait to more than 50 locations throughout Iraq.  For its work there, Supreme Group received a special performance award from the British Ministry of Defense for "the outstanding service provided by Supreme on Operation Telic [operations in Iraq].   Supreme has set the benchmark for service deliveries in operational theatres . . . ."

61.     When combined with Supreme Group's more than 50 years experience in general military support in hostile regions throughout the world, this experience in Iraq and Afghanistan clearly made Supreme the most qualified bidder for the re-bid Fourth Contract in Iraq.   With annual sales in excess of $1.5 billion, Supreme Group's relative size compared to IOTC also made Supreme a far more attractive candidate for such a large project.

62.     Second, based on public information Supreme has been able to gather on the price IOTC bid for the Fourth Contract, Supreme's bid was roughly $40 million lower than IOTC's bid. The Pentagon has since confirmed that IOTC's bid was higher than competing bids for the job.

63.     Third, in addition to the $40 million in direct savings the U.S. government would have received from awarding Supreme the Fourth Contract, it would have also received tens of millions of dollars in additional savings from the significant value add-ons Supreme included in

18

its bid. These included, at no cost to the government, the construction of a dedicated facility for the storage of bulk fuels, the provision of security escorts to accompany the convoy deliveries into Iraq, and a dedicated vehicle support and maintenance program, to name just a few. Supreme included these additional services in its bid to address the critical fuel supply chain deficiencies the U.S. government was facing under its existing contract with IOTC. The government expressed significant interest in Supreme's plan to address these deficiencies.

64.    Fourth, the U.S. government was clearly looking for an alternative to using IOTC as its major supplier of fuels in Iraq. The government was in an ongoing dispute with IOTC over the government's policy of destroying IOTC's broken down delivery vehicles. The government had to pay IOTC several million dollars to settle a prior dispute. And, the current contract exposed the military to serious fuel supply chain deficiencies. Nothing else can explain why the DESC re-opened the Fourth Contract within months of its original award to IOTC or why the DESC provided Supreme with several extensions of time to secure the necessary LOA.

65.    For all of these reasons -- Supreme's price, the better value terms of its bid, Supreme's prior experience and proven quality and capability, and the government's evident interest in selecting an alternative supplier to IOTC -- Supreme would have won the re-bid Fourth Contract but for defendants' conspiracy to prevent it from obtaining the necessary LOA.

### C.    Harm to Supreme and the Competitive Process

66.    As a result, Supreme has been harmed in the amount of the profits it would have otherwise received from its work on the Fourth Contract.

67.    Defendants have not only harmed Supreme, they have harmed the competitive process generally by preventing any real competition for the Fourth Contract. Since defendants' conspiracy ensured that defendants were the only bidders to obtain the necessary LOA,

19

defendants were the only bidder that qualified for the contract.   Defendants' scheme thus undermined the government's entire purpose for using DESC in the first place; namely, to avoid the original Halliburton controversy by ensuring a competitive process for selecting the most cost-effective contractor to perform the military fuels supply work in Iraq.

68.     In disrupting the competitive process, defendants' scheme has harmed the U.S. government by forcing it to pay significantly higher prices for fuel than it otherwise would have paid if the re-bid Fourth Contract had been subject to real competition.   Had Supreme been able to fairly compete for the contract, the government would have paid roughly $40 million less for the contract and would have received tens of millions of dollars more in additional savings from the value added services Supreme would have supplied.

69.     IOTC's distortion of the competitive process and its consequent ability to overcharge the U.S. government by tens of millions of dollars is the direct result of its continuing conspiracy to bribe Al-Saleh and Jordanian government officials to ensure that no other bidders can obtain the necessary LOA.

### CLAIMS FOR RELIEF

#### FIRST CLAIM

(RICO Act Violation - 18 U.S.C. §§ 1962(a) & (c))

70.     Plaintiff repeats and realleges paragraphs 1-69 of this complaint as if fully set forth herein.

71.     Plaintiff Supreme and each defendant and co-conspirator is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962 (a) and (c).

72.     Defendants and their co-conspirators comprised a group of persons associated together for the common purpose of carrying out the conspiracy described in this complaint.

This conspiracy principally involved the making of illicit payments to Al-Saleh and high-level Jordanian government officials in exchange for ensuring that defendants would be the only bidders on the DESC Iraq fuel supply contracts to receive the LOA from Jordan.  Defendants and their co-conspirators thus constitute an association-in-fact enterprise under 18 U.S.C. §§ 1961(4) and 1962 (a) and (c).

73.     Defendants and their co-conspirators have been part of this enterprise and have carried out this conspiracy since IOTC Jordan won the first DESC Iraq contract in 2004. Throughout this time, their conspiracy and enterprise was engaged in, and its activities affected by, interstate and foreign commerce, within the meaning of 18 U.S.C. § 1962 (a) and (c).

74.     Each of the defendants and their co-conspirators participated in the conspiratorial conduct through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), and in violation of 18 U.S.C. § 1962 (a) and (c).  This included defendants' illicit payments to Al-Saleh and Jordanian officials to ensure defendants received the only LOA in connection with the multiple DESC contract awards in 2004, 2005, and 2007 worth more than one billion dollars in aggregate.  Defendants made these payments on a regular basis.  For Al-Saleh, these payments were based on a one-third profit draw from IOTC Jordan.  For the Jordanian officials, the payments were based on a fee per ton of the fuel supplied under the contracts, an amount that increased with every contract.

75.     Defendants' conduct also violates 18 U.S.C. § 1962(a) since defendants took some or all of the proceeds from their racketeering activity and invested them in IOTC and the other "IOTC" entities that defendants Sargeant and Abu-Naba'a created after forming IOTC Jordan and without the knowledge and consent of Al-Saleh.

76.     During all relevant times, defendants and their co-conspirators engaged in

21

"racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth herein.  These acts constitute a violation of one or more of 18 U.S.C. § 1952 (racketeering through violations of the Travel Act and Foreign Corrupt Practices Act) and 18 U.S.C. § 1956 (money laundering).  Under Florida law, the acts set forth herein also constitute commercial bribery under § 838.16 of the Florida Crimes Code which also constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1).

77.    Each of the defendants committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

78.    These acts of racketeering activity constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  These acts were related by virtue of common participants, a common victim, a common method of commission, and the common purpose and result of securing for defendants the DESC contracts to supply fuels to the U.S. military in Iraq by making regular and repeated bribery payments to Al-Saleh and Jordanian government officials.  This conspiracy began in 2004 with the government's award of the first DESC Iraq fuels supply contract and has continued with every DESC contract award since then.

79.    As a result of defendants' RICO Act violation, the U.S. government has overpaid for these contracts by tens of millions of dollars and plaintiff Supreme has been injured from its loss of the re-bid Fourth Contract that was worth almost one billion dollars.  Supreme has been injured by its loss of the profits it would have earned from that contract, which is an amount yet to be determined but which is at a minimum tens of millions of dollars, prior to trebling, and from the substantial costs it incurred in preparing a bid for this contract.

22

## SECOND CLAIM

(Conspiracy to Violate RICO Act - 18 U.S.C. § 1962(d))

80.     Plaintiff repeats and realleges paragraphs 1-69 of this complaint as if fully set forth herein.

81.     Plaintiff Supreme and each defendant and co-conspirator is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

82.     Defendants and their co-conspirators conspired to commit the violation of the RICO Act just described in violation of 18 U.S.C. § 1962(d).

83.     As set forth herein, defendants and their co-conspirators have since 2004 been associated with the enterprise to secure through bribery the DESC Iraq fuels supply contracts. They have also since 2004 agreed and conspired to violate 18 U.S.C. § 1962(c) by participating, either directly or indirectly, in the pattern of racketeering activity described herein. Defendants have committed, or caused to be committed, a series of overt acts in furtherance of the conspiracy alleged herein and for the purpose of effecting the object of the conspiracy which was to be the only recipient of the Jordanian LOA and thus the only eligible bidder on the DESC contracts.

84.     As a result of defendants' conspiracy to violate the RICO Act, the U.S. government has overpaid for the DESC Iraq contracts by tens of millions of dollars and plaintiff Supreme has been injured from its loss of the re-bid Fourth Contract which was worth almost one billion dollars. Supreme has been injured by its loss of the profits it would have earned from that contract, which is an amount yet to be determined but which is at a minimum tens of millions of dollars, prior to trebling, and from the substantial costs it incurred in preparing a bid for this contract.

## THIRD CLAIM

(Sherman Act Section 1 Violation - 15 U.S.C. § 1)
(Unlawful Restraint of Trade)

85.     Plaintiff repeats and realleges paragraphs 1-69 of this complaint as if fully set forth herein.

86.     Defendants and their co-conspirators have entered into a continuing illegal contract, combination, or conspiracy in restraint of trade, the purpose and effect of which is to foreclose competition in the re-bidding of the Fourth Contract.  This contract, combination, and conspiracy is illegal – both *per se* and under the Rule of Reason – under Section 1 of the Sherman Act, 15 U.S.C. § 1.

87.     Defendants' contract, combination, or conspiracy was comprised of Defendants' efforts and agreement with their co-conspirators to prevent any other company to obtain the necessary LOA for the Fourth Contract in exchange for payments to Al-Saleh and key Jordanian officials.

88.     Defendants' contract, combination, or conspiracy has caused substantial anticompetitive effects in the market for the re-bidding of the Fourth Contract.  It has done so by eliminating all competition in the bidding for the contract and by causing the U.S. government to pay substantially more for the contract for lesser services than had the contract been subject to open competition.

89.     As a direct result of these violations of Section 1 of the Sherman Act, Supreme was foreclosed not only from winning the Fourth Contract award, but from qualifying for the bid at all.  Supreme was thus injured in its business and property in an amount not presently known, but which is, at a minimum, tens of millions dollars, prior to trebling.

90.     Such violations and the effects thereof are continuing and will continue unless

24

injunctive relief is granted.  Supreme has no adequate remedy at law.

## FOURTH CLAIM

(Tortious Interference With Business Relations)

91.     Plaintiff repeats and realleges paragraphs 1-69 of this complaint as if fully set forth herein.

92.     Supreme had an existing relationship with the DESC through its attempted bid on the Fourth Contract and through its significant contract work for the DESC in Afghanistan.  In fact, the Fourth Contract work in Iraq on which Supreme was bidding was precisely the type of work it was already performing for the DESC in Afghanistan.  It was this prior experience that made Supreme such an attractive option to the DESC for taking over the Fourth Contract from IOTC.

93.     Defendants were well aware of Supreme's relationship with DESC and the threat Supreme posed to taking over IOTC's contract work in Iraq, and in particular, the Fourth Contract that was up for re-bid.

94.     Through their bribery scheme to prevent Supreme and all other potential bidders from obtaining the necessary LOA, defendants intentionally and without justification interfered with Supreme's relationship with DESC and with DESC's re-award of the Fourth Contract to Supreme.

95.     As a result of defendants' conspiracy, Supreme was prevented from qualifying for and winning the Fourth Contract and was thereby injured in its business and property in an amount not presently known, but which is, at a minimum, tens of millions dollars.

## FIFTH CLAIM

(Violation of Florida Civil Remedies for Criminal Practices Act - Fla. Stat. § 772.103)

96.     Plaintiff repeats and realleges paragraphs 1-69 of this complaint as if fully set forth herein.

97.     For the reasons set forth above, defendants have violated the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.103 (1), (3), and (4), which is Florida's state law version of the RICO Act, and which tracks the RICO act virtually verbatim.

98.     Specifically, as described in more detail in paragraphs 71 through 84, Defendants and their co-conspirators have, since 2004, comprised a group of persons associated together for the common purpose of carrying out the conspiracy described in this complaint to ensure that defendnats would be the only bidders on the DESC Iraq fuel supply contracts to receive the LOA from Jordan.  Each of the defendants and their co-conspirators participated in this conspiratorial conduct through a pattern of racketeering activity including but not limited to illicit payments to Jordanian officials (in violation of 18 U.S.C. § 1952), money laundering (in violation of 18 U.S.C. § 1956), and commercial bribery (in violation of § 838.16 of the Florida Crimes Code).

99.     As a result of each of defendants' violations of this statute, the U.S. government has overpaid for the DESC Iraq contracts by tens of millions of dollars and plaintiff Supreme has been injured from its loss of the Fourth Contract, which was worth almost one billion dollars. Supreme has been injured by its loss of the profits it would have earned from that contract, which is an amount yet to be determined but which is at a minimum tens of millions of dollars, prior to trebling, and from the substantial costs it incurred in preparing a bid for this contract.

26

## SIXTH CLAIM

(Violation of Florida Antitrust Act - Fla. Stat. § 542.18)

100.    Plaintiff repeats and realleges paragraphs 1-69 of this complaint as if fully set forth herein.

101.    For all of the reasons set forth above, defendants have violated the Florida Antitrust Act, Fla. Stat. § 542.18, which is Florida's state law version of Section 1 of the Sherman Act, and which tracks that statute virtually verbatim.

102.    Specifically, as described in more detail in paragraphs 86 through 90, Defendants and their co-conspirators have entered into a continuing illegal contract, combination, or conspiracy in restraint of trade, the purpose and effect of which is to foreclose competition in the re-bidding of the Fourth Contract. Defendants' contract, combination, or conspiracy has caused substantial anticompetitive effects in the market for the re-bidding of the Fourth Contract.

103.    As a direct result of these violations of the Florida Antitrust Act, Supreme was foreclosed not only from winning re-bidding of the Fourth Contract, but from qualifying for the bid at all.

104.    Supreme was thus injured in its business and property in an amount not presently known, but which is, at a minimum, tens of millions dollars, prior to trebling.

## SEVENTH CLAIM

(Violation of Florida Deceptive and Unfair Trade Practices Act – Fla. Stat. § 501.204)

105.    Plaintiff repeats and realleges paragraphs 1-69 of this complaint as if fully set forth herein.

106.    For all of the reasons set forth above, defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204.

27

107.   As a direct result of these violations of the Florida Deceptive and Unfair Trade Practices Act, Supreme was prevented not only from winning re-bidding of the Fourth Contract, but from qualifying for the bids at all.

108.   Supreme was thus injured in its business and property in an amount not presently known, but which is, at a minimum, tens of millions dollars.

## RELIEF SOUGHT

WHEREFORE, Supreme requests the following relief:

A.   That the Court declare, adjudge, and decree that defendants have committed the violations of federal and state law alleged herein;

B.   That defendants, their directors, officers, employees, agents, successors, and assigns be permanently enjoined and restrained from, in any manner, directly or indirectly, engaging in any unlawful means to secure any future government contracts for work in Iraq or elsewhere, preventing Supreme or its affiliates from obtaining a Jordanian LOA or any other government authorization required under a DESC contract, and committing any other violations of the RICO Act or the Sherman Act or of other statutes having a similar purpose and effect;

C.   That the Court award damages to Supreme from defendants' violations of the RICO Act and Section 1 of the Sherman Act in an amount to be proven at trial, to be trebled according to law, plus interest (including prejudgment interest);

D.   That the Court award Supreme attorneys' fees and costs of suit, and such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues triable by jury.

DATED: October 21, 2008

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
*Counsel for Plaintiff Supreme Fuels Trading FZE*
Museum Tower – Suite 2200
150 West Flagler Street
Miami, FL  33130
Telephone No.:  (305) 789-3200
Facsimile No.:  (305) 789-3395

By: _____
      Ana T. Barnett
      Florida Bar No.: 217212
      abarnett@swmwas.com
      Gerald E. Greenberg
      Florida Bar No.:  440094
      ggreenberg@swmwas.com

Of Counsel:

CONSTANTINE CANNON LLP

Robert L. Begleiter
rbegleiter@constantinecannon.com
Gordon Schnell
gschnell@constantinecannon.com
Gerald J. Britton
gbritton@constantinecannon.com
Adam Nyhan
anyhan@constantinecannon.com

450 Lexington Avenue
17th Floor
New York, NY  10017
Telephone No.:  (212) 350-2700
Facsimile No.:  (212) 350-2701

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases**

ELECTRONIC

**Oct. 21, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA.- MIAMI

D.C.

## I. (a) PLAINTIFFS

Supreme Fuels Trading FZE

**(b)** County of Residence of First Listed Plaintiff **Foreign**
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Ana T. Barnett, Esq., Gerald E. Greenberg, Esq., Stearns Weaver Miller, et al., 150 West Flagler Street, Suite 2200, Miami, FL 33130

## DEFENDANTS

Harry Sargeant III, Mustafa Abu-Naba'a, International Oil Trade Company, LLC, International Oil Trade Center

County of Residence of First Listed Defendant **Palm Beach**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☑ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☑ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

WPB 08CV 81215 Hurley/ [handwritten] Palm Beach County

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☐ NO   b) Related Cases ☐ YES ☐ NO

JUDGE _____ DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

18 U.S.C. 1962(a), (c), and (d) and 15 USC Section 1

LENGTH OF TRIAL via **14** days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ At least $10million before trebling.

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD
s/ _[signature]_

DATE

**FOR OFFICE USE ONLY**

AMOUNT **350** RECEIPT # **989146** IFP